IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| RAAHID SALAH GAFFNEY d/b/a Stop & Go Deli, | ) ) ) | |
| Plaintiff | ) | |
| v. | ) | No. 1:17-00393-MSM-LDA |
| | ) | |
| UNITED STATES DEPARTMENT OF AGRICULTURE, FOOD AND NUTRITION SERVICE RETAILER OPERATIONS DIVISION, | ) ) ) ) | |
| Defendant. | ) ) | |

MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

## I.    INTRODUCTION

A family of four living in the contiguous United States on an annual income of less than $26,500 is living below the poverty line.[1] Approximately 13.7% of American families are defined this way. *2021 Poverty Guidelines: U.S. Federal Poverty Guidelines Used to Determine Financial Eligibility for Certain Federal* Programs,

---

[1] *2021 Poverty Guidelines: U.S. Federal Poverty Guidelines Used to Determine Financial Eligibility for Certain Federal* Programs, ASPE (Feb. 1, 2021), https://aspe.hhs.gov/topics/poverty-economic-mobility/poverty-guidelines/prior-hhs-poverty-guidelines-federal-register-references/2021-poverty-guidelines. The threshold is $33,130 in Alaska and $30,480 in Hawaii. *Id.* These figures are updated periodically in the Federal Register by the U.S. Department of Health and Human Services under the authority of 42 U.S.C. § 9902(2). *Id.*

ASPE (Feb. 1, 2021), https://aspe.hhs.gov/topics/poverty-economic-mobility/poverty-guidelines/prior-hhs-poverty-guidelines-federal-register-references/   2021-poverty-guidelines (last accessed Sept. 16, 2021).   As of June 2021, more than 42 million persons in more than 22 million households received a government subsidy to assist with the purchase of household food.   *Program Information Report (Keydata),* USDA, (June 2021), https://fns-prod.azureedge.net/sites/default/files /data-files/Keydata%20 June%202021.pdf. According to the Center on Budget and Policy Priorities, about 54,200 of those households are in Rhode Island.   *Snap Helps Low-Wage Workers in Every State*, CENTER FOR BUDGET AND POLICY PRIORITIES, https://www.cbpp.org/snap-helps-low-wage-workers-in-every-state#RhodeIsland (last accessed Sept. 21, 2021).

## A.  Food Stamps and Supplemental Nutrition Assistance Program

Since 1964,[2] the federal government, through the United States Department of Agriculture ("USDA") has supplemented the spending power of hundreds of thousands of low-income families by subsidizing food purchases.   A family in Rhode Island is eligible for subsidized food if its gross income is at or below 185% of the poverty line ($4,040/month for a family of four) and if its assets are limited.[3]   The

---

[2] A brief food stamp project was deployed between 1939 and 1943, but it ended when the economic conditions that gave rise to it abated.   *A Short History of SNAP*, USDA, https://www.fnsusda.gov/snap/ short-history-snap#1939 (last accessed Sept. 17, 2021) [hereinafter *SNAP History*].

[3] The income limit for a family of four that includes an elderly or disabled person is $4,368 per month.   In certain circumstances, liquid and certain other assets may be considered in determining eligibility.   *Eligibility & How to Apply: Am I Eligible for Supplemental Nutrition Assistance Program (SNAP)?*, DHS,   https://dhs.ri.gov/ programs-and-services/supplemental-nutrition-assistance-program-snap/supplemental-nutrition-0 (last accessed Sept. 17, 2021); *see also* 7 U.S.C. § 2014(g)(1) (2018).

modern-era Food Stamp program began as a pilot project in 1961 and was permanently enacted into law when President Lyndon B. Johnson signed the Food Stamp Act of 1964. *Snap History*, *supra* at n. 5. Under the Act, the government distributed monthly coupons, redeemable at retail establishments selling food products. In 1984, electronic debit transfer cards ("EBT") began to be tested in place of stamps and by 2002 all states were under a mandate to use them, applying national standards and guidelines. Electronic Benefit Transfer Interoperability and Portability Act of 2000, P.L. 106-171. In 2008, the program was re-structured as the Supplemental Nutrition Assistance Program ("SNAP"). Food, Conservation, and Energy Act of 2008, P.L. 110-234. Congress declared that its purpose is "to promote the general welfare, to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households." 7 U.S.C. § 2011 (2008). It was designed to combat the fact that "the limited food purchasing power of low-income households contributes to hunger and malnutrition among members of such households." *Id.* The nomenclature was permanently changed: recipients now get "SNAP benefits," not "food stamps." 7 U.S.C. § 2012(d) (2018).

The detailed framework of statutes and regulations, generally codified at 7 U.S.C. § 2011 *et seq*, governs a system in which retail stores selling eligible foods[4] may apply to become qualified participants. 7 U.S.C. § 2018 (2020) (application

---

[4] Non-food products (such as cigarettes, alcohol, paper supplies, cleaning supplies, and myriad other household purchases) are ineligible. In addition, foods that are hot at the point of sale are ineligible. *What Can SNAP Buy?*, USDA, https://www.fns.usda.gov/snap/eligible-food-items (last accessed Sept. 22, 2021).

criteria).   Once qualified, a store can accept a SNAP card for payment and be reimbursed by the government.   7 U.S.C. § 2019 (2018).   To become qualified, applicant stores must agree to a set of standards and must also agree to process all SNAP transactions through Point-of-Service ("POS") machines that transmit detailed data to a central USDA database.  Each state is responsible for certifying households and issuing EBT cards, 7 U.S.C. § 2020(a)(1) (2018), but within USDA, the program is administered by the Food Nutrition Service division ("FNS").

B. Violations and Enforcement

Among the rules that SNAP has laid down, none seems a higher priority to the agency than the one that forbids retailers from exchanging SNAP benefits for something other than eligible food.  In particular, and relevant to this case, retailers are forbidden from taking SNAP benefits in exchange for cash, an infraction that would then allow the SNAP card holder to use the cash for non-SNAP purchases. These infractions fall under the heading "trafficking," which is defined, *inter alia,* as the buying or selling of SNAP benefits for cash and not eligible food items.[5]

FNS developed, maintains, and monitors a system of enforcement that relies in large part on computer-driven analyses of the data fed into the central database by every participating store.   Each transaction involving EBT cards is entered nationwide.   The system reviews the data for each participating store in search of

---

[5] "Trafficking" also includes trading EBT benefits for firearms, purchasing SNAP products with the intention to resell them, purchasing products solely to redeem their containers for cash, as well as a few other prohibited behaviors. 7 C.F.R. § 271.2 (1978).

anomalies, which include patterns of transactions that deviate from expected or average behaviors in food purchases. These patterns, according to the agency, are indicative of trafficking because they signal contrived or fake purchases. There are seven such patterns for which the automated program is looking (ECF No. 36 ¶ 25): (a) multiple transactions that end in the "same cents" value (*e.g.*, ending in $.50), (b) multiple transactions ending in the same dollar value, usually a flat dollar amount (*e.g.*, $20.00), (c) multiple transactions on the same card in a matter of just hours at the same store, (d) a particular store processing multiple transactions in a time frame (minutes or even seconds) too short to reflect calculation of prices of actual items, (e) a household depleting all or a suspiciously large proportion of its monthly allotment of SNAP benefits too near the beginning of the month, (f) manual transaction counts, and (g) transactions for excessively large amounts of money that seem unreasonable for the store's character if the store is one with limited stock and low-priced items. (ECF No. 36-3 at 10.)

## II.    THIS CASE

This case involves the "Stop & Go Deli" ("the Deli"), a small convenience store and deli in Woonsocket, Rhode Island, that was accused for the first time and found guilty of trafficking. In keeping with the seriousness with which FNS views trafficking, the store was permanently disqualified from participating in the SNAP program. After a series of administrative steps resulting in a final decision upholding those findings, the proprietor of the Deli, Raahid Salah Gaffney ("Mr. Gaffney"), filed this complaint seeking judicial review of both the adjudication and the penalty.

### A. **The Store**

The Deli was authorized in April 2014 to accept SNAP benefits. (ECF No. 11-3 at 3.)  The Deli is classified as a convenience store and estimated to be only about 800-900 square feet in total area. *Id*. at 7, 15.  Everything for sale is contained in the customer area of the store; there is no additional storage space.  *Id*. at 15.  The Deli is one of 35 SNAP-authorized stores within a one-mile radius.  (ECF 11-5 at 15.)   In 2014, at the time of authorization, the Deli had shopping baskets and an optical scanner but no shopping carts, no adding machines or calculators, no hot food, no meat, no seafood specials, and no fruit or vegetable boxes.  (ECF No. 11-3 at 14.)  In July 2016, the Deli expanded to 24-hour/day service offering a full deli menu of hot and cold food.  (ECF No. 11-7 at 4, 27.) The hot food items may not be purchased with SNAP benefits.  *Id*. at 28.

The primary tool for enforcement of the SNAP rules is the Anti-Fraud Locator Using EBT Retailer Transactions program ("ALERT").  (ECF No. 36-3 at 5.)  This computer-driven application scans all transactions nationwide looking for patterns that raise a suspicion of trafficking or other violations.  Those patterns are discussed below.  At this juncture, it is sufficient to note that the Deli appeared on the radar of FNS when "the EBT ALERT system [revealed] patterns consistent with trafficking violations." (ECF No. 11-5 at 8.)[6]  In August 2016, an FNS investigator visited the store pursuant to an investigation and noted that it had: no shopping carts and no

---

[6] There is a dispute between the parties, and indeed between USDA personnel, as to whether the ALERT system brought the Deli to the attention of FNS or something else did; the Court finds this dispute irrelevant.  *See* discussion *infra,* Part IVA.

baskets; no EBT point-of-sale device; no adding machines or calculators; no optical scanner; and no meat, seafood specials, or fruit and vegetables boxes for sale. (ECF No. 11-4 at 6.)  While the investigator was at the store, she took pictures of the inventory and diagrammed the layout of the Deli.  (ECF No. 11-5 at 10-14.)  Those items are in evidence for purposes of this motion.  Although the Deli claims to have frozen chicken for sale for $20.00 per bag (its most expensive eligible SNAP food offering), the on-site investigator made "no indication of chicken being sold in the business" at the time of the visit. (ECF No. 11-7 at 28.)  Additionally, the investigator noted that the "counter top [sic] is truncated as there are two Plexiglass columns on each side." (ECF No. 11-5 at 12.)  The investigator also noted that the remaining counter space was further limited with impulse-buy items and a PIN pad device, both severely constricting space on which to place food items for checkout.  *Id.*  The Deli's "inventory contains almost exclusively inexpensive single-serving, prepared food items and accessory foods."  *Id.* at 6. Additionally, the Deli offers non-food items such as: "tobacco, household goods, paper products, and health/beauty aids."  *Id.* at 15.

### B.  The Process

In addition to sending an investigator to do an on-site inspection, FNS analyzed SNAP transaction data from August 2016 to January 2017 ("Review Period"), a roughly four-month period.  On March 6, 2017, FNS, pursuant to 7 C.F.R. § 278(6)(b)(1) (1978), sent the Deli a Charge Letter notifying it that it was being charged with trafficking SNAP benefits as defined in 7 C.F.R. § 271.2, and warning of a potential penalty of permanent disqualification. (ECF No. 11-5 at 24-26.)  The regulations allow a store receiving a Charge Letter only ten days in which to request a civil monetary penalty ("CMP") in lieu of disqualification and to submit evidence in support of that alternative sanction.  *Id.*; *see also* 7 C.F.R. § 278.6(b)(1).  On March 17, 2017, the Deli responded to the Charge Letter and submitted some receipts and photographs from the store as evidence to rebut the allegation of trafficking.  (ECF No. 11-7 at 4-23.)  The attorney for the Deli wrote, "On behalf of my client, we feel that any suspension or monetary penalty imposed would be a premature and unfair decision since my client has not violated any SNAP regulations." *Id*. at 5.  There was no request in that response for a CMP in lieu of disqualification.  Instead, the letter explicitly resisted any penalty.

FNS is required to review its initial determination as well as any additional evidence submitted in response to the Charge Letter, and then issue a final determination.  7 C.F.R. § 278.6(c).  On April 26, 2017, FNS sent a Final Determination Letter informing the Deli that it was not eligible for a CMP and that the permanent disqualification would be effective immediately.  (ECF No. 11-7 at 32-

33.)  Specifically, FNS determined that the Deli "failed to submit sufficient evidence to demonstrate [the Deli] had established and implemented an effective compliance policy and program to prevent violations of" SNAP.  *Id*.

### III.    JURISDICTION AND STANDARD OF REVIEW

The Court's jurisdiction is statutory, granted specifically by Congress in the SNAP scheme itself.  A retailer who is aggrieved by a finding of violation, or by the penalty imposed for one, may, after receiving a final agency decision, seek judicial review by the filing of a complaint in the District Court.  7 U.S.C. § 2023(a)(13) (2008).  Mr. Gaffney did that on August 25, 2017.  (ECF No. 1.)

The judicial review of the administrative finding is *de novo*.  *Irobe v. USDA*, 890 F.3d 371, 377 (2018); *see also* 7 C.F.R. 279.7(c) (2005); 7 U.S.C. § 2023(15) (2008).  The sanction, however, may be disturbed only if the court finds it to be arbitrary and capricious.  *Irobe*, 890 F.3d at 377.  "[A] sanction is arbitrary and capricious if it is unwarranted in law or without justification in fact." *Cross v. United States*, 512 F.2d 1212, 1218 (4th Cir. 1975); *see also* 7 U.S.C. 2021(a)(16).

### IV. THE EVIDENCE

USDA has moved for summary judgment, to which Mr. Gaffney has objected.  (ECF Nos. 34, 39.)   The evidence submitted in favor of or opposed to summary judgment consists of: USDA's Statement of Undisputed Facts ("SUF") (ECF No. 33), Mr. Gaffney's Responding Statement of Disputed Facts ("SDF") (ECF No. 36), the Administrative Record ("AR") (ECF No. 11-3 to 11-10), USDA's answers to interrogatories (ECF No. 36-1), the deposition of Section Chief Michael Skaer ("Mr.

Skaer") as well as an Affidavit from him (ECF Nos. 33-1, 36-2),[7] and the deposition of system analyst Douglas Wilson ("Mr. Wilson") who manages a computer-driven program designed to ferret out trafficking (ECF No. 36-3). The Court must scrutinize not only the administrative record, but also the entire record established relative to this motion. *Irobe*, 890 F.3d at 377.

### A.   Patterns Indicating Trafficking

FNS identified four patterns in the Deli's transactions that it believed were indicative of trafficking. Its Charge Letter, sent on March 3, 2017, described those patterns, and attached four printouts of individual EBT transactions that it viewed as demonstrative of those patterns.[8]

---

[7] Mr. Skaer is Section Chief for the FNS Retailer Operations Division, Investigative Analysis Branch. (ECF No. 36-2 at 8.). His Declaration Affidavit supports the agency's SUF.

[8] The agency gives examples of several of these anomalous transactions:

For example, Household ("HH") 6210 spent $109.74 in EBT benefits at Stop & Go on August 1, 2016. Eight hours later, HH 6210 spent $28.24 at a Super Stop & Shop with SNAP benefits. The next day, HH 6210 returned to Stop & Go and spent $56.48 in SNAP benefits. Household 6210 spent 85% of its monthly allotment at Stop & Go, a small and minimally stocked convenience store, and only 14.5% at a large supermarket. In addition to spending the majority of its monthly allotment at a small convenience store, HH 6210's three transactions in a short time frame is consistent with trafficking in SNAP benefits. (AR 69-70).

Similarly, HH 3309 redeemed $176.96 in SNAP benefits at Stop & Go on November 1, 2016. One hour later, HH 3309 went to an Aldi Supermarket and spent $5.37. Eight minutes later, HH 3309 spent $10.96 at a Walmart Supercenter. Of the $192.89 of EBT transactions conducted by HH 3309 in one day, 92% was at Stop & Go. FNS determined that the excessively large EBT transaction at Stop & Go, followed by two small transactions at larger, better-stocked, and

Attachment 1 listed 2,109 individual transactions whose cost was a flat dollar amount, ending in $.00, or a half-dollar amount, ending in $.50. (ECF No. 36 ¶ 68). The USDA alleged there were an abnormally high number of these transactions which "generally don't occur in legitimate transactions." *Id.* ¶ 97. Mr. Gaffney maintains that the transactions were within established norms. (*Id.* ¶ 96-97). In addition, he maintained that because SNAP-eligible items are not subject to sales tax, his pricing scheme which often charged flat dollar amounts would result in even-dollar totals. *Id.* ¶ 68.

---

competitively priced supermarkets within such a short time frame was potentially indicative of trafficking in SNAP benefits. (AR 70).

Household 0487 redeemed $510.41 in SNAP benefits in eight transactions between January 2, 2017 and January 6, 2017. The transactions at Stop & Go totaled $317.07 (62%), and $188.47 (37%) was spent at two large supermarkets. (AR 70-71). FNS determined that there was no credible explanation for HH 0487 to spend 62% of its monthly allotment at Stop & Go when it had access to and also shopped at better-stocked and competitively priced supermarkets. In addition, the exhaustion of the monthly allotment of benefits within four days in the first week of the month is atypical when compared to the known shopping habits of SNAP recipients. (AR 70- 71, 205).

Significantly, the three individual households appeared in several of the four categories of EBT transactions identified by FNS. In Attachment 1 (same cents values): HH 6210 appeared one time, HH 0487 seven times, and HH 3309 three times. (AR 75-114). In Attachment 2 (multiple transactions by the same household in short time frames), there were three sets of transactions by HH 6210, two sets by HH 3309, and one set by HH 0487. (AR 115-21). In Attachment 3 (the majority or all of the monthly benefits exhausted in a short time frame), HH 6210 and HH3309 both appeared two times. (AR 122-23). Finally, for Attachment 4 (large transactions), HH 6210 appeared six times, HH 0487 appeared seven times, and HH 3309 appeared six times. (AR 124-32).

(ECF No. 33-1 ¶¶ 47-50.)

Attachment 2 contained a list of fifty-one sets of transactions (118 discrete transactions) showing multiple purchases by the same household during a single twenty-four-hour period. (ECF No. 36 ¶¶ 69, 70.) To the agency, that is a pattern that is unlikely if the purchases were for foodstuffs. Mr. Gaffney responds that people return to the store for added or forgotten purchases, that he cannot, as a store owner, prohibit SNAP recipients from making such return trips, and that there was no comparison to stores like his that demonstrated that multiple purchases in a twenty-four-hour period is unusual. *Id.*

Attachment 3 lists thirty-nine alleged violations in fourteen sets of transactions revealing households exhausting a majority of total monthly benefits in an "unusually short time frame." (ECF No. 33, ¶ 71.) Mr. Gaffney's formal response, in the SDF, is that FNS failed to conduct a comparison to other similar stores and, because the ALERT system failed to trigger, there was no such pattern. (ECF No. 36, ¶ 71.)

Attachment 4 lists 505 transactions that FNS considered "'excessively large' for a store of the type and size of Stop & Go." *Id.* ¶ 72. Four of those were for $150 or more, twenty were for $100 or more, and twenty-seven were for $90 or more. *Id.* ¶ 73.

While Mr. Gaffney offered some responses described below proposing innocent explanations, his primary defense was that the failure of the ALERT system to trigger

in some way constituted affirmative evidence negating trafficking.[9]  He attempted to turn the positive statement that "the ALERT system triggers when there is evidence indicative of trafficking" into a negative: "when the ALERT system does not trigger, that is evidence of no trafficking."  That attempt, which reflects a misstep in logic, is unsuccessful for several reasons.

First, the evidence was not undisputed that there was no ALERT trigger in the first instance.  Mr. Wilson testified in his deposition that he "believed" there was no ALERT trigger–that the catalyst for the investigation was something else.  (ECF No. 36-3 at 5.)  Mr. Skaer, however, testified that there was a triggering ALERT and that no complaints had instigated the investigation.  (ECF No. 36-2 at 43, 48.)  But even if ALERT had not triggered, there was no evidentiary support for the proposition that the failure to trigger warranted a conclusion from the data that no patterns indicative of trafficking existed.  The system could have failed for any number of reasons, or the agency could have simply failed to record an alert.  When a cold-weather alarm system fails to notify a homeowner that the temperature inside the house has fallen to thirty degrees, and the water pipes are freezing, that is not proof that it was not cold outside: it is simply proof that the alarm failed to notify the company, or the company failed to notify the homeowner.  It is Mr. Gaffney's burden to prove the lack of trafficking by a preponderance of the evidence, and the failure of ALERT to trigger–

---

[9] For example, Mr. Gaffney contends in his SDF that "At no time did the Alert system produce an alert against Plaintiff as to any of these patterns. Therefore it is beyond dispute that the there is no variance in the patterns at Stop and Shop [sic] that met the criteria for the suspected trafficking charged by the agency."  (ECF No. 36 ¶ 74.)

absent some testimony or other evidence showing that the only explanation for the failure is that no trafficking patterns in fact occurred–does not satisfy that burden.

Third, the testimony was clear that the SNAP database produced printouts of four categories of transactions that were strong evidence of trafficking and FNS conducted an analysis of that data, comparing it against that of other comparable stores.  (ECF No. 33-1 ¶ 26.)  Whether the analysis was performed because the ALERT system triggered it or because an analyst caused it to happen is not relevant and does not constitute a defense.

## B. *De Novo* Review of Violations

The Court is obliged to conduct a *de novo* review of the evidence before it and has done so.  A *de novo* review gives no weight to the agency's findings and looks at the "entire matter" to reach its own conclusion; the inquiry is much broader than an administrative review that examines merely whether "substantial evidence" exists to support the agency decision.  *Irobe,* 890 F.3d at 376.  After conducting that *de novo* review, this Court concludes that Mr. Gaffney has not satisfied his burden of proving that no trafficking occurred.  It is significant that Mr. Gaffney does not contest the accuracy of the data itself.  FNS may rely on an analysis of data from the database to prove trafficking.  7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6.

In addition to failing to meaningfully contest the data analysis, Mr. Gaffney has failed to provide meaningful or logical explanations for the patterns shown.  With respect to the same-cents pricing, he contends that because many items in the store had prices ending in $.00 or $.50, same-cents even-dollar total transactions would be

14

expected in legitimate purchases.  But he has submitted no price list to substantiate his claim that many items were priced that way.  A price list backing up his assertions could have created a genuine issue of material fact.  *Duchimaza v. United States,* 211 F. Supp. 3d 421, 433-34 (D. Conn. 2016) (without price list or other evidence of prices claimant's claim of multiple same-cents transactions unsupported).  As the First Circuit has noted, the claimant is in the best position to come up with evidence about the store.  *Irobe,* 890 F.3d at 378.  The photographs that are part of the record show no pricing on shelves underneath the items displayed.  The only prices that are evident are for non-eligible items (*e.g.,* $1.00 for hot dogs, 2 lamb-and-rice meals for $5.00).  (ECF No. 11-5 at 4, 14.)  A bag of frozen chicken that Mr. Gaffney claimed to sell for $20.00 was not present in the store when the field investigator was on-site. (ECF No. 11-7 at 28.)  Mr. Gaffney presented receipts showing purchases of items in amounts ending in $.00 or $.50, but none of those receipts identify the items purchased and it is no more likely than not that they were all, or even mostly, SNAP-eligible items considering the large number of non-eligible convenience items the store sells.  *Id.* at 14-16.  Moreover, the receipts offered by Mr. Gaffney show all the payment types for the transactions as "CASH," and so are not clearly receipts for SNAP transactions.  *Id.*  As such, the proffered material is not "significantly probative" to meet his burden.  *Irobe,* 890 F.3d at 377 (partially quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986).

As for household patterns, Mr. Gaffney explained that some households have many members who use the same card and might each purchase from the store in the

same short period.  He produced no affidavit or testimony supporting that claim, much less any specific rebuttal to the household patterns shown by the data.[10] Similarly, in response to the unusual number of households exhausting their SNAP benefits soon after the monthly allotment, he offered only conclusory statements that these might be households who had exhausted their previous month's benefits before the end of the month and would therefore be exceptionally hungry and in need of food at the beginning of the next month.  While that may be true of some, Mr. Gaffney has not offered anything but speculation.

In response to the allegation of an anomalous number of large purchases, he makes two responses, neither of which rebuts the inference of trafficking.  First, he maintains that he had expensive items in the store.  But apart from the frozen chicken for $20.00, which was not in stock during the site visit, he has identified no such items.  Presenting receipts showing alleged purchases of $20.00 items and $30.00 items when there is no item costing $30.00 in the store, and when neither item is identified as SNAP-eligible, has no probative value.  The inference of trafficking from the large dollar transactions is particularly strong.  This is a store without shopping carts or baskets.  There is no way to carry a large number of items to the cash register.  And, once there, no place to set them down, as the counter space is limited to the width of the cashier.  *See Nadia Int'l Mkt v. United States,* No. 5:14-

---

[10] It is fair to consider the absence of evidence that the plaintiff could have produced. *See Irobe,* 890 F.3d at 380 ("Nor has the Store attempted to establish the bona fides of so much as a single transaction pinpointed by the agency (even though each of those transactions is clearly linked to a specific household).").

cv-82, 2015 WL 7854290 at *6-7 (D. Vt. Dec. 2, 2015) (in a store with one POS device, no scanners, no conveyor belts, limited baskets, and no carts, and a 3' x 4' checkout area, it is implausible that enough items could be processed quickly enough to account for high dollar purchasing).  The final agency decision noted,

> the limited availability of counter space for checking out and the lack of shopping carts and baskets [render it] not plausible that the store's customers are carrying large amounts of food around the store with no shopping carts and no shopping baskets.  Customers purchasing such large quantities of food items would have to hold them in their arms, or enlist the help of others while shopping

(ECF No. 11-8 at 31.)  And even if a fleet-footed, long-armed customer could, the store has but one cash register and no optical scanner, so the cashier would be hard-pressed in the time shown simply to cash out the dozens of items required to constitute a $100 total purchase.  *See Arias v. United States,* No. 13-cv-8542 (HBP), 2014 WL 5004409, at *7 (E.D.N.Y., Sept. 29, 2014) ("implausible" that cashier could cash out $67 worth of SNAP benefits thirty-five seconds after a previous transaction, or $70.59 in SNAP benefits fifty-eight seconds after a previous purchase).  "The speed and size of the identified transactions strongly suggests that Townsend Deli was exchanging SNAP benefits for cash." *Id.*

While he does not challenge the integrity of the printouts, Mr. Gaffney does challenge the analysis by asserting that there was no meaningful comparison to the pattern of transactions in other stores.  He asserts first that his is "the only [participating store] within a two (2) mile radius."  (ECF No.  11-7 at 4.)  The Court finds that implausible and credibly contradicted by the FNS claim that there were at the time 35 SNAP-authorized EBT participating retailers within a one-mile radius.

(ECF No. 11-5 at 15.)   In its comparison, FNS found that the Deli's average EBT transaction during the Review Period was 142% higher than comparable stores.  *Id.* At 21.   Mr. Gaffney next maintains that his store had undergone significant renovations in July 2016 when he was licensed to sell cooked food.  As a result, the store began to offer a full-service deli and a greatly expanded hot food menu.  (ECF No. 11-7 at 4).[11]  Without providing any specifics, he invites the conclusion that either FNS had compared the Deli to stores it no longer resembled or that the addition of more hot food somehow itself explained the pattern of purchasing the data revealed. The only clear evidence of expanded offerings, however, was in the hot and prepared food case where post-renovation signs offered burgers, hot dogs, lamb-over-rice and other prepared dishes.  None of those items are SNAP-eligible and so their addition is not a convincing explanation of the patterns indicating trafficking.

Based on the evidence before the Court, there is no genuine dispute of material fact.[12]  The USDA and Mr. Gaffney differ on the *meaning* given to undisputed data,

---

[11] There was no deposition taken of Mr. Gaffney and he submitted no affidavit.  Many of his assertions were made in the way of argument without any substantiating evidence.  Because none of them hold water in any event, as is true of this one, the failure to submit them in an evidentiary form is not result-determinative.

[12] These cases seem to follow a typical pattern. Many of them concern small convenience store, with few employees and little equipment suited to handling large shopping orders.  The USDA is armed with masses of statistics showing deviations from average legitimate purchasing patterns. Typically store owners do not dispute the actual data but instead attempt to explain why the data is not suspicious.  *See e.g., Saudabad Convenience, Inc. v. United States*, No. 13-0298-ML, 2014 WL 611194, at *1 (D.R.I., Feb. 18, 2014) (small store with no conveyor belt, no basket, no carts, no optical scanner and a very small check-out counter; multiple purchases by different households too quickly to be credible (sixty-one in range of twenty-two seconds to three minutes), 181 sets of transactions for same-household in short period of time; eighty-one households either depleting their entire benefits in one week or all or the

but not only does Mr. Gaffney bear the burden of proof, USDA has offered interpretations supported with analysis of actual data.  Mr. Gaffney has countered with either irrelevant facts (such as the expansion of hot-food items), assertions that are unsupported (such as prices ending in even dollar amounts), or unsubstantiated and speculative conclusions (such as the monthly buying habits of SNAP households).  These are not materials of evidentiary quality.  *Irobe,* 890 F.3d at 377 (citing *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 49-50 (1st Cir. 1990)).  Conclusory subjective beliefs need not be credited.  *Torrech-Hernandez v. General Elec. Co.,* 519 F.2d 41, 47 n.1 (1st Cir. 2008).  Mr. Gaffney does not have to rebut or explain away each transaction, *Irobe,* 890 F.3d at 381 n.3, but since a penalty may rest on *any* fair inference of trafficking, Mr. Gaffney would have to explain away all four categories, each of which would support a conclusion of trafficking.  *Nadia Int'l Mkt,* 2015 WL 7854290 at *7.  The Court finds that on this record, having made its own independent assessment of the evidence, it agrees with the agency's determination that the Deli trafficked in SNAP benefits as defined in § 271.2.

## C.  Disqualification

Mr. Gaffney seeks relief from the disqualification penalty imposed by FNS.  In lieu of disqualification, he seeks a CMP.  Permanent disqualification is authorized by § 7 C.F.R. § 278.6(e) for a first violation and even for a single violation of trafficking.  7 U.S.C. 2021(b)(3)(B).  Contrary to the review of the evidence of violation, the Court's

---

majority of benefits in a single transaction; and fifty out of 181 transactions exceeding $50 when the average for similar stores in the area was $11).

review of the sanction imposed is very limited.  The agency's determination of a penalty must be accepted unless "arbitrary and capricious." *Irobe,* 890 F.3d at 377; *Objio v. United States*, 113 F. Supp. 2d 204, 208 (D. Mass. 2000).

Under the statutory scheme Congress laid out, a monetary penalty may be imposed in lieu of disqualification, but only where the store owner specifically requests it within ten (10) days of receiving notice of the charge and notice that disqualification is a possible penalty.  7 C.F.R. § 278.6(2)(iii).  In addition, the store owner must provide substantial evidence that the store meets four criteria for a CMP. 7 U.S.C. 2021(b)(3)(B).[13]  Here, Mr. Gaffney received a letter dated March 6, 2017, that informed him that "under certain conditions, FNS may impose a civil money penalty (CMP) of up to $59,000.00 in lieu of permanent disqualification of a firm for trafficking."  The letter directed his attention to § 278.6(i) of the SNAP regulations for the four criteria that must be met to be considered for a CMP.  In addition, it notified him that he "*must meet each of the four criteria listed and provide the documentation as specified within 10 calendar days of [his] receipt of this letter.  No extension of time can be granted for making a request for a CMP or for providing the required documentation.*"   (ECF No. 11-5 at 24-25) (emphasis supplied).

It is clear that Mr. Gaffney did not request a CMP within the ten-day period. Indeed, at no time prior to the filing of his complaint in his case did he request a CMP.

---

[13] That the store had "an effective policy and program in effect to prevent violations …," that neither the ownership nor the management was aware of or involved in the violating conduct and that neither benefited from it, and that the management of the store was not aware of and did not benefit more than one previous violation.  *Id.*

Instead, his response to the Charge Letter was to maintain that no penalty at all was warranted. The absence of a timely request for a CMP is sufficient reason, without more, to reject his challenge to disqualification. *Nadia Int'l Mkt,* 2015 WL 7854290, at *8 (claimant failed to timely request CMP or provide factual evidence on which it could be granted). Even if he had requested it in time, such a request must be supported by "substantial evidence that such store or food concern had an effective policy and program in effect to prevent violations of the chapter and the regulations." 7 U.S.C. 2021(b)(3)(B). Mr. Gaffney's submissions to the agency consisted of his letter of March 17, 2017, which simply described the renovation, claimed to be the only EBT operation within a two-mile radius, asserted that he was located within a public housing complex, and offered explanations for the anomalous data. He further offered photographs of the store and the receipts labeled "cash." (ECF No. 11-7 at 4-5, 9-16). Nothing in that response provided a basis for a CMP in lieu of disqualification.

Beyond the lack of evidence submitted that might warrant a CMP, disqualification is a frequent and standard penalty for trafficking. *See e.g., Irobe,* 890 F.3d at 379 (permanent disqualification based on trafficking proven by data analysis); *Idias v. United States,* 359 F.3d 695, 696 (4th Cir. 20004) (same); *Saudabad Convenience, Inc.,* 2014 WL 611194, at *2 (same); *Suuqa Bakaro Grocery v. USDA,* No. 2:16-cv-25-DBH4, 2017 WL 3141919, at *1 (D. Me., July 24, 2017) (same); *Duchimaza,* 211 F. Supp.3d at 440 (permanent disqualification not arbitrary or

capricious); *Arias,* 2014 WL 504409, at *11 (same); *Kahin v. United States,* 101 F. Supp. 2d 1299, 1299 (S.D. Cal. 2000) (same).

The number of violations found by FNS over a four-month period warranted disqualification.   Mr. Gaffney contends that disqualification of his store would present a hardship to the community.  Considering the competent evidence submitted by FNS of nearly three dozen SNAP-participating convenience stores or grocery stores within a one-mile radius of the Deli, and the data showing that EBT patrons of Stop & Go shop at other nearby SNAP retailers, that claim is not sufficient for this Court to disturb the penalty imposed.

## V.    CONCLUSION

For these reasons, USDA's Motion for Summary Judgment, both as to the finding of trafficking and the disqualification imposed, is GRANTED.


IT IS SO ORDERED:

_____
Mary S. McElroy
United States District Judge

Date:  September 30, 2021